

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00154-CV

**IN THE INTEREST OF A.K.B.**, C.J.B., and M.L.A.B., Children

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2021-CI-04539
Honorable David A. Canales, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:        Patricia O. Alvarez, Justice
               Liza A. Rodriguez, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: June 20, 2024

AFFIRMED

This is an appeal from a judgment terminating appellant's parental rights to his children, A.K.B., C.J.B., and M.L.A.B., and appointing the children's maternal grandparents as their managing conservators.[1] A jury found that appellant had engaged in conduct which endangered the children's physical or emotional well-being, and that termination of his parental rights would be in the children's best interest. On appeal, appellant argues (1) appellees failed to meet their evidentiary burden to establish standing to seek conservatorship; (2) the testimony of two of appellees' expert witnesses is "no evidence"; (3) the evidence is legally and factually insufficient to support the jury's termination findings; (4) the trial court erred by not excluding certain expert

---

[1]To protect the identity of the children, we refer to them by their initials and persons through whom they might be identified by aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

testimony; (5) the termination judgment is barred by issue preclusion; and (6) the trial court erred by appointing appellees as managing conservators of the children. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Tragically, the children's mother, Kelly, died in October 2019 from a single gunshot wound to the head. At the time, M.LB. was four years old, C.J.B. was two years old, and M.L.A.B. was two months old. The College Station Police Department ("CSPD") investigated the circumstances surrounding Kelly's death and concluded that Kelly had committed suicide.

Almost a year and half after Kelly's death, on March 11, 2021, appellees filed the underlying suit, in which they alternatively pleaded for termination of appellant's parental rights under section 161.001 of the family code, and for conservatorship of the children by a non-parent over a living parent whose rights have not been terminated under section 153.131 of the family code. As to their termination claim, appellees alleged that appellant had engaged in conduct which endangered the children's physical or emotional well-being by shooting and killing the children's mother, Kelly, and that termination of appellant's parental rights was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(E),(2). Appellees also asked the trial court to appoint them the children's temporary managing conservators and to order psychological testing of the children.

On April 6, 2021, appellant answered the suit, denying the allegations in appellees' petition. Appellant also filed a motion to dismiss, arguing that appellees lacked standing to bring their claims.

In April 2021, the trial court held a four-day temporary orders hearing. After this hearing, the trial court appointed appellant and appellees joint managing conservators of the children and ordered the children to remain with appellant in the paternal grandparents' home. The trial court also found that denying appellees access to the children "would substantially impair the children's emotional well-being."

Trial was set for January 9, 2023. A month before trial, appellant moved for summary judgment, arguing that appellees' termination claim was barred by issue preclusion. Appellant's issue preclusion argument was based on a no-evidence summary judgment that had been granted in appellees' wrongful death suit in Brazos County, Texas. Appellant also moved to exclude appellees' experts because their disclosures were untimely and deficient and their experts' opinions were unreliable. At a pretrial hearing, the trial court denied appellant's summary judgment motion and his motion to exclude appellees' experts based on untimely disclosures. Appellant's remaining challenges to appellees' experts were deferred until trial.

Appellees' claims were tried to a jury, which made findings to support the termination of appellant's parental rights. The jury did not reach the jury charge questions regarding appellees' conservatorship claim.

The trial evidence consisted of testimony from twenty-two witnesses and more than 170 exhibits, including police reports, Kelly's medical records, mortgage statements, bank statements, legal documents, text messages, and photographs. The evidence relevant to the issues presented on appeal is summarized below.

***Kelly's Death and the Investigation***

In 2019, Kelly, appellant, and the children were living in a house in College Station, Texas. Just before 6:00 a.m. on October 3, 2019, appellant called 911 and reported that Kelly had committed suicide. Upon arriving at the house, CSPD officers found Kelly's body in the master bedroom. Her body was on the bed, stomach-down, with the covers pulled up to the top of her waist. Her head was turned to the side and facing left. Kelly had a bullet wound above her left ear, near her temple. Blood saturated the pillows and sheets near her head. A gun was nowhere near her body.

The lead detective assigned to the case, Jose Primo Alaniz III, arrived at the scene about a half hour after the initial responding officers. By then, the officers had found a .357 magnum revolver on the counter in the adjoining bathroom. Alaniz noted the position of Kelly's body and arms on the bed, and the location of the revolver on the bathroom counter. Kelly's arms were bent at the elbows with her hands near her head. Alaniz learned that appellant, Kelly's husband, was the only other adult in the house when Kelly was shot. Appellant told Alaniz that Kelly had given birth to their third child only two months ago and they believed that Kelly was suffering from post-partum depression. He also told Alaniz that Kelly was under financial stress. As to his actions that morning, appellant told Alaniz that he was in the living room with A.K.B. and M.L.A.B. when he heard a gunshot and ran to the master bedroom where he found Kelly on the bed with a bullet wound to her head. Appellant told Alaniz that he picked up the revolver, carried it to the bathroom, placed it on the counter by the sink, washed his hands, and called 911.

CSPD forensic technicians documented the scene by taking photographs of Kelly's body and the interior of the house. They retrieved a single spent bullet from the pillow under Kelly's head. It was later confirmed that this bullet was fired from the revolver found in the bathroom. A CSPD forensic investigator wrote in her report: "Both [Kelly's] hands were in a fist-like shape, her fingers curled into the palms. She was reported to have had a gun in her left hand." CSPD's field notes included a diagram of Kelly's body, indicating that her elbows were bent. A notation on the diagram states Kelly's body was "face down on bed, hands near face."

A CSPD forensic investigator collected gunshot residue ("GSR") samples from appellant's hands and sent them to a lab for testing. A GSR sample was collected from Kelly's left hand at the medical examiner's officer. The results of GSR testing showed gunshot residue on Kelly's hand, but not on appellant's hands. The revolver was tested for fingerprints, but no fingerprints were found on it.

Deputy medical examiner Jennifer E. Dierksen, M.D. performed the autopsy and prepared a report detailing her findings. Dierksen had been told that Kelly "had a history of post partum depression and recent financial difficulties, [from] which [it] can be inferred that she was under stress." The autopsy revealed that the bullet had entered Kelly's left temple and exited her right temple. The bullet's trajectory was "left to right, slightly upward and slightly front to back." Based on the autopsy findings and the information about Kelly's post-partum depression and financial difficulties, Dierksen concluded that Kelly's manner of death was suicide.

During the investigation, Alaniz had several conversations with appellant, but never asked him about the inconsistencies in the statements he made to the officers on the day Kelly died. Nor did Alaniz verify appellant's statements about Kelly's alleged post-partum depression and her financial stress. After receiving the medical examiner's report and the GSR test results, Alaniz concluded that Kelly had committed suicide. Alaniz's supervisors reviewed the case and recommended no further action by Alaniz. CSPD forwarded the case to the district attorney's office, which did not pursue any criminal charges. Thereafter, CSPD's case file was reviewed by a Texas Ranger, Joshua Ray, who opined that nothing in the case file disproved CSPD's conclusion that Kelly's death was a suicide. Appellees, however, disagreed with CSPD's conclusion that Kelly's death was a suicide.

### Appellees' Testimony

#### Kelly's Father

Kelly's father, Paul, testified that he typically saw Kelly, appellant, and the children twice a week—every Friday for dinner and every Sunday at church. He had never known Kelly to be depressed or down or unhappy for an extended period of time. And, he had not seen anything in Kelly's recent demeanor that would lead him to believe that she would kill herself. The news of Kelly's death was "a shock."

The day before she died, Kelly had called her mother and Paul's wife, Sara, asking for help. Sara put the phone "on speaker," and they had a conversation with Kelly and appellant. Kelly told her parents that she and appellant were being evicted from their house. An eviction notice had been placed on their door, stating they had three days to vacate. Appellant told appellees that they were being evicted because the mortgage company had foreclosed on their house. Paul asked appellant if all the mortgage payments had been made, and appellant assured him that they had. Paul asked appellant if he had received any notices before the foreclosure, and appellant said he did not. Paul told appellant and Kelly that he did not think it was legal for a mortgage company to foreclose on a house without providing some kind of notice.

Paul believed that Kelly and appellant needed an attorney's help, but he did not know anyone who could help them. Paul called his father, who said he had a contact at the district attorney's office who might be able to help Kelly and appellant or, at a minimum, refer them to an attorney who could help them. Paul suggested that appellant and Kelly go to the district attorney's office the next morning to talk to this contact. Paul also suggested that appellant and Kelly gather proof of the mortgage payments to bring with them. Appellant and Kelly agreed that they would go to the district attorney's office the following morning. Paul offered to go with them, but appellant did not want him to go. Kelly's mother, Sara, offered to babysit while appellant and Kelly went to the district attorney's office. Appellant and Kelly agreed that Sara would come over early the next morning to babysit while they went to the district attorney's office to try to find someone to help them deal with the eviction.

The following morning, Paul learned of Kelly's death. When he was told that Kelly had shot herself, he "fell to the floor."

The day after Kelly died, Paul was upset. He was bothered that the "mortgage company was irresponsible enough to evict [his] children out of their home without notice." Paul wanted to

follow up with the mortgage company and, if possible, take some action. Paul asked appellant if he and Kelly had gathered proof of the mortgage payments. Appellant told Paul that they did not because Kelly had told him that they were losing their house because *she* had missed three mortgage payments. Appellant's claims about Kelly missing three mortgage payments was so different from what Kelly and appellant had previously told him and it made no sense to Paul. As time passed, and more of the details surrounding Kelly's death came to light, Paul became convinced that Kelly did not commit suicide and that there was more to the story.

In the months following Kelly's death, Paul kept in touch with the lead detective, Alaniz. Eventually, Alaniz told Paul that CSPD had concluded that Kelly's death was a suicide and its investigation was being closed. However, appellees did not believe that the police had thoroughly investigated Kelly's death, and they hired a private investigator to find out the truth. By hiring a private investigator, appellees learned things that the police had not discovered. For example, the private investigator learned that many mortgage payments had been missed on the couple's house, and that appellant had filed a legal action to try to stop the foreclosure. Although Kelly was a co-owner of the house, she was not a party to the legal action filed by appellant. Additionally, some of the details surrounding Kelly's death, like the revolver being found in the bathroom, did not make sense to Paul.

### Kelly's Mother

Kelly's mother, Sara, testified that Kelly had called her the evening before she died. The first thing Kelly said to her was, "Mom, we are all fine." After that, Paul and appellant joined the call. Sara agreed with her husband's testimony about the substance of the phone conversation. Paul had told Kelly and appellant to gather their documents to prove that they had made the mortgage payments, and Paul offered to go to the district attorney's office with them, but appellant did not

want him to go. All four of them agreed that Sara would come over early the next morning to babysit while Kelly and appellant went to the district attorney's office to get help with the eviction.

Sara said that, prior to Kelly's death, she had loved appellant and had thought that he was a great father. But not long after Kelly's death, her relationship with appellant changed. Sara felt that appellant was lying to them. In their phone conversation the evening before Kelly died, "appellant assured us their mortgage payments were paid auto draft, $1500 a month. That's what he said. And then the day of [Kelly's] death he start[ed] telling us and other people that they [had] lost their home because [Kelly had] missed three payments." As Sara learned more about the circumstances surrounding Kelly's death, her suspicions about appellant grew. By October 2020, Sara firmly believed that appellant was responsible for Kelly's death.

According to Sara, she and Kelly enjoyed a close relationship, seeing each other at least twice a week. The week before she died, they had gone to lunch together. Sara saw that Kelly was taking good care of herself and her new baby. After lunch, Kelly wanted to show Sara her new inventory of children's clothing. That same afternoon, Kelly was having a pop-up show for her business, and Sara watched Kelly load clothes and racks into her car for the show.

As to Kelly's health, Sara testified that Kelly had delivered all three of her children by C-section, which was major surgery. But Kelly never had a problem recovering. After each child's birth, Kelly was able to take care of her children and do the daily chores. Sara knew that Kelly suffered from joint pain. However, Kelly's joint pain lessened when she was pregnant. And, even when her joint pain was at its worst, Kelly was able to move around and take care of her children. In the year before her death, Sara saw nothing in Kelly's demeanor or behavior indicating that she was depressed or suicidal. Furthermore, prior to Kelly's death, appellant never mentioned to her that he was concerned about Kelly's physical or mental health. At this point, Sara did not trust appellant to tell the truth about Kelly's health.

***Appellant's Testimony***

Appellant testified that he and Kelly were married in 2013. They decided to buy a house in 2015. When they purchased the house, Kelly was working full-time as a registered nurse. Appellant was also employed. When their first child, A.K.B., was born, Kelly started working part-time so she could spend more time with her. By the time their third child, M.L.A.B., was born, Kelly was still working part-time as a nurse, but she had also started an at-home boutique selling children's clothing. Appellant remained employed.

Appellant made the mortgage payments on the house from a bank account that was in his name only. Kelly was not listed on this bank account. Appellant did not believe that Kelly had the login information for their mortgage account. Appellant admitted that it was not uncommon for him to "get behind" on mortgage payments and then "catch up" the next month. Appellant could not remember how many delinquency letters the mortgage company had sent him over the years. Appellant also admitted that on February 4, 2019, Wells Fargo Bank had obtained a judgment against him for $17,165.46 in credit card debt. The judgment was not against Kelly, who was not named on the Wells Fargo account.

Two days before Kelly's death, on October 1, 2019, appellant was working out of town when he received a call from Kelly telling him that there was an eviction notice on their front door. According to appellant, Kelly was upset and shocked. Appellant told his supervisor about the eviction notice, claiming that he did not know what was going on because he was current on all his mortgage payments. These statements were untrue. At trial, appellant admitted that he had lied to his supervisor about being current on his mortgage payments, but he claimed he that lied because he was too embarrassed to tell him the truth. After Kelly called him and told him about the eviction notice, appellant left work and went home.

The day before Kelly's death, on October 2, 2019, appellant had a phone conversation with Kelly and appellees. The purpose of the call was to tell appellees about the eviction notice. Appellant admitted that he told his father-in-law that he had made all the mortgage payments on the house even though this statement was not true. In fact, according to appellant, he had not made a mortgage payment on the house since sometime in 2018. The mortgage was in default by December 2018, and the mortgage company was sending them default notices. Appellant tried to stop the mortgage company from foreclosing on the house by filing a petition in court. His name appeared on the petition, but Kelly's did not. Appellant was able to delay the foreclosure sale, but it was only temporary. The house was eventually reposted for foreclosure, and he received another notice regarding the foreclosure sale. When appellant talked to Kelly and appellees on October 2, 2019, he knew that the foreclosure sale had already occurred, but he did not tell them. Instead, he went along with the plan to go to the district attorney's office to seek help to prevent the eviction. Appellant also testified that after hanging up with appellees, he and Kelly decided to go look for a house to rent instead of going to the district attorney's office.[2]

Appellant claimed that Kelly was aware of the notices they received about the foreclosure, but he could not provide any proof that she knew about them. He did not have a certified mail receipt, or a witness who saw Kelly open the foreclosure notices. Appellant pointed out that even before receiving the foreclosure notices, he and Kelly had received delinquency notices from their mortgage company, which were addressed to both of them. Appellant also asserted that both he and Kelly checked the mail.

---

[2]This part of appellant's trial testimony differed from some of the statements he made to one of the responding officers on the morning of Kelly's death. The officer, Ramsey Miguel Castillo, wrote in his report that appellant told him that he and Kelly were "going to go to the clerk[']s office to get an extension of their eviction today."

Appellant admitted that the day after Kelly died, he told Paul that it was Kelly who had failed to make three mortgage payments. Appellant also admitted that this statement was untrue, and that he was blaming Kelly for the missed mortgage payments.

Appellant testified that the morning Kelly died, he woke up very early and took the baby to the living room to give her a bottle. As he was feeding the baby in the living room, he heard a gunshot in the master bedroom.[3] When he went to the bedroom, he found Kelly lying on the bed with a lot of blood around her head. Appellant claimed that the revolver was on the bed near Kelly's waist. Appellant picked up the revolver and carried to the bathroom counter, washed his hands, and called 911. Appellant believed that Kelly committed suicide because she was depressed, in pain, and overwhelmed.

Appellant also testified that Kelly was right-handed. He acknowledged that in his previous testimony he was not able to say if Kelly was left-handed or right-handed. He also testified that he and Kelly had taken a firearms course together. He claimed that during the course he had encouraged Kelly to shoot with her left hand, but Kelly resisted shooting with her left hand because she was more comfortable shooting with her right hand.

Appellant described Kelly as a hard-worker and punctual. Kelly always made sure the children were well taken care of. In the weeks before her death, there was no decline in Kelly's appearance. Kelly was taking care of herself, keeping her nails manicured, and dressing well. Kelly had recently joined a gym and was working out again. Appellant acknowledged that Kelly took a lot of pride in her clothing business.

---

[3]Notably, at the scene, appellant gave inconsistent statements to the officers about what had happened that morning. He told one officer that while he was in the living room feeding the baby, Kelly walked into the living room, told him she was going to take a shower, and walked back into their bedroom. He told another officer he was in the baby's room when heard the gunshot. He told yet another officer that both he and Kelly had awakened early and discussed their plans for the day before Kelly told him that she was going to take a shower when he took the baby to the living room to feed her.

As to Kelly's physical health, appellant claimed there were times when Kelly would experience "very, very debilitating" joint pain and she would "want to curl up in a ball." There was no pattern or consistency to her joint pain, but when it flared up, there were "more bad days than good days." In the year and months preceding Kelly's death, appellant had noticed changes in Kelly—she was in physical pain, sad, and struggling to get through the day. According to appellant, it was hard for Kelly to complete tasks, and she was not her normal self a lot of days.

Appellant did not find a suicide note from Kelly or any other writing indicating that she intended to hurt herself. Appellant acknowledged that the children were Kelly's top priority and she loved them. Appellant expected the jury to believe that Kelly killed herself without any warning because that is what happened. Appellant told the jury that he did not kill Kelly. Appellant agreed that a father who kills his children's mother should not be permitted to raise his children. Appellant denied that he had had an affair with a co-worker before Kelly died. However, he acknowledged that he dated a co-worker about two months after Kelly's death.

***The Experts' Testimony***

<u>Coulson</u>

Danny O. Coulson, who had thirty-one years' experience in conducting and supervising investigations for the Federal Bureau of Investigations ("FBI"), testified on appellees' behalf. Prior to trial, Coulson reviewed CSPD's file, which contained the written reports of multiple CSPD officers, photos taken by CSPD's forensic investigators, the body camera videos of the responding officers, the medical examiner's report, the lead detective's deposition, and a report prepared by appellees' ballistics expert, Jamie Becker. In reviewing these materials, Coulson employed the same techniques that he had used in conducting and supervising investigations for the FBI. Based on his experience, Coulson saw deficiencies in CSPD's investigation. First, the initial responding officers moved Kelly's body. Second, the scene was not secured and Kelly's body was not handled

so as to minimize cross-contamination. Third, the lead detective never arranged to have the oldest child, who was in the house and heard the gunshot, interviewed by a forensic interviewer.[4] Finally, Alaniz never interviewed appellant at the police station.

Coulson further expressed concern that Alaniz did not consider the feasibility of Kelly shooting herself with the revolver found at the scene. The autopsy showed that the bullet had entered Kelly's left temple and had exited her right temple in a fairly straight line. Coulson explained that the revolver that shot Kelly was a "very heavy," "38-ounce" firearm with a long barrel. It was "extremely powerful, [with] significant recoil." He doubted that Kelly, who was right-handed and of "fairly small stature," could have self-inflicted her wound with the .357 revolver using her non-dominant hand, especially because she was lying on her stomach at the time. According to Coulson, the question was, "Given the length of the barrel and the length of her arm, is she capable to get the gun left-handed, reach the trigger . . . and to discharge it into herself?" Using a replica training revolver, Coulson demonstrated for the jury how difficult it would have been for Kelly to have shot herself in this manner. Another fact that troubled Coulson was that no fingerprints—not even Kelly's—were found on the revolver. According to Coulson, because there was "not a single fingerprint found on the gun either on the yolk, the cylinder, the frame, the barrel, [or] anyplace else"—then "somebody had to wipe that gun down." Coulson was not troubled by the gunshot residue found on Kelly's hands, explaining that one would expect to see GSR on a shooting victim.[5] Nor was Coulson troubled by the lack of GSR on appellant's hands

---

[4]Another witness testified that forensic interviewers are specially trained to interview children so as not to lead them to a particular answer.

[5]Coulson's testimony was consistent with the disclaimer contained in the GSR lab report in this case, which states:

> A shooting victim clearly has been associated with a firearm discharge, and the results of GSR testing usually cannot offer any more information than what is already known…. Since more gunshot primer residue escapes from the barrel than from near the handle, the majority of both

because appellant told the officers at the scene that he had washed his hands after handling the revolver. Based on these facts and circumstances, Coulson opined that Kelly did not commit suicide.

*Harrison*

Kit William Harrison, Ph.D., a licensed psychologist specializing in neuropsychology and forensic issues testified on appellee's behalf. Harrison had handled issues related to suicide and homicide in some of his previous cases. According to Harrison, significant substance and alcohol abuse is the first risk factor for suicide. He testified that "persons who commit suicide almost always have a substance abuse problem." A substantial history of severe mental health disorders, such as bipolar disorder with psychotic features or major depression, is the second risk factor for suicide. Harrison also explained that suicide rates are lower for women than for men, and that suicide rates "plummet" "if the woman has a child." Additionally, Harrison testified that women are less likely to use a firearm to commit suicide than men.

By trial, Harrison had reviewed Kelly's medical records, the autopsy report, the police reports, the private investigator's report, and appellant's deposition. Harrison testified about the facts that contraindicated suicide, including Kelly's lack of past substance or alcohol abuse, her lack of past mental illness, and the unlikelihood that Kelly would shoot herself with her children present in the house. Notations in Kelly's medical records indicated that Kelly, who had given birth to her third child two months before she died, suffered from "mild" post-partum depression. But Harrison explained that post-partum depression, standing alone, is not a risk factor for suicide.

---

homicide and suicide victims have gunshot primer residue on their hands. Conversely, a small percentage of both homicide and suicide victims have no gunshot primer residue on their hands. Therefore, neither the presence nor the absence of gunshot primer residue on a victim's hands would provide definitive interpretation of either homicide or suicide.

This lab report, which was prepared by the Texas Department of Public Safety, was admitted into evidence.

Because of Kelly's lack of risk factors for suicide as well as the other circumstances surrounding her death, Harrison opined that Kelly—more likely than not—did not commit suicide.

*Becker*

Jamie Becker, a forensic firearms expert, testified that she had worked in firearm and toolmark identification for the last thirty years. In this case, she was asked to perform distance determination testing and, if possible, ascertain the location of the revolver when it was fired. Distance determination can be very important in cases involving an alleged suicide because it can sometimes rule out suicide altogether.

Becker began her analysis in this case by examining the revolver and the bullet used in Kelly's shooting. Thereafter, she performed distance testing using a revolver of the same make and model and the same type of bullet. The testing involved firing the revolver into pieces of tool cloth at different predetermined distances. Becker was interested in the gunshot residues that were propelled from the gun during the firing process and the replication of those residues at the specified distances. Becker compared the results of these test firings with the pattern of residues documented in the photos of Kelly's wound that were taken at the scene and at autopsy. Based on these comparisons, Becker opined that the muzzle of the revolver was further than one inch and closer than six inches from Kelly's skin when it was fired. Becker categorized her findings as "close range." Becker also opined that the muzzle of the revolver was not in contact with Kelly's skin when it was fired, and she ruled out a "contact" finding.

Becker noted that the medical examiner, Dierksen, had stated in her report that the "range of fire" was "contact to close." Becker explained that "contact" and "close" are two of the broad categories that medical examiners use in their reports. Becker disagreed with the "contact" finding but she agreed with the "close" finding.

*Dierksen*

Appellant called Dierksen, the medical examiner, to testify as an expert. Dierksen explained that in shooting deaths she looks for characteristics to ascertain the "range of fire." In this case, Dierksen observed a wide band of dense gunpowder and a stippling abrasion surrounding the bullet's entrance wound, which caused her to conclude that the entrance wound was "indicative of a contact to close-range gunshot wound." Dierksen opined that the revolver was either touching Kelly's skin or was in close range when it was fired. According to Dierksen, a "contact-to-close-range gunshot wound of the head" "is most commonly seen with suicide-related gunshot wound injuries." However, she also acknowledged that "contact-to-close" distance findings could signify either suicide or homicide.

Dierksen further testified that, in her practice, the most common method of committing suicide was by gun. Dierksen was aware of the statistics concerning the differences in the way men and women commit suicide, but she did not let statistics inform her judgment. Instead, Dierksen made a case-by-case determination about whether the manner of death was suicide. Although Dierksen concluded that Kelly's manner of death was suicide, she also considered CSPD's investigative findings in making this decision. On cross-examination, Dierksen explained that "[i]f [the] investigative findings" in this case "had demonstrated either a confession or other proof of homicide, that would have been [her] manner" of death conclusion.

*Alaniz*

Appellant also called the lead detective, Alaniz, to testify. Alaniz testified that on the morning of Kelly's death he arrived on the scene about thirty minutes after the initial responding officers. They informed Alaniz the case was an apparent suicide by a self-inflicted gunshot wound. When Alaniz walked into the bedroom, he observed that Kelly's body was "face down" on the bed. Her arms were bent, with her hands resting near her head. Her cell phone was "propped up"

or "leaning" against her forehead when he arrived on the scene. Alaniz acknowledged that the initial responding officers may have disturbed the location of the cell phone when they rolled Kelly's body on its side while searching for the firearm.[6]

At the scene, Alaniz talked to appellant, whom he described as "in shock." Appellant told Alaniz that he had recently taught Kelly to shoot the revolver, which they stored in the top drawer of a dresser in the bedroom. They owned additional firearms, which were kept separately in a safe. Appellant told Alaniz that they believed that Kelly was suffering from post-partum depression. He also told Alaniz that he and Kelly were having financial struggles.

Alaniz did not think that appellant's moving the revolver was problematic because he had seen that occur in other cases. He did not consider appellant's statements about finding the revolver in Kelly's hand and finding the revolver on the bed to be inconsistent because appellant was "going through a lot." Before this case, Alaniz had never worked on a case requiring him to determine if the cause of death was homicide or suicide.

Alaniz concluded that Kelly's death was a suicide. The lack of gunshot residue on appellant's hands, and the presence of gunshot residue on Kelly's left hand were important to his conclusion. Alaniz acknowledged the disclaimer in the lab report about GSR and shooting victims, but he was still convinced that the GSR on Kelly's hand was proof that she had fired the revolver. In fact, once Alaniz received the GSR lab report, he believed appellant's story.

Alaniz acknowledged that appellant's story about what happened on the morning of Kelly's death had changed, but Alaniz did not take these inconsistencies into consideration during the investigation. Alaniz was not too concerned with the changes in appellant's story because of his

---

[6]After watching a body camera video from one of the initial responding officers, Alaniz testified that when the officers first entered the bedroom Kelly's left hand was turned up and it looked like there was a lot of blood on it. He also noted that when the initial responding officer rolled Kelly's body over, it changed the position of her left hand. Alaniz agreed that this information could be significant to determining whether the revolver was ever in Kelly's hand.

observations of appellant at the scene and his own interview of him, the lab results showing appellant had no GSR on his hands, and the lab results showing that Kelly had seven particles of GSR on her hand. Alaniz had confidence in his conclusion because his supervisor had reviewed the case.

During his investigation, Alaniz never determined if Kelly was left-handed or right-handed, and he did not think about interviewing the four-year-old child in this case. Alaniz never interviewed any collateral sources to determine if there was marital discord between appellant and Kelly. Nor did he gather any bank records or obtain Kelly's medical records as part of his investigation. He never asked for any financial records or foreclosure records. When Kelly's father told him that appellant had a motive for killing Kelly, Alaniz and his supervisors did not deem it necessary for them to investigate any further.

*Ray*

Joshua Ray testified that he was employed by the Texas Ranger Division of the Texas Department of Public Safety, which handles major violent crimes, public corruption, and complex cases. At the urging of Kelly's father, Ray agreed to review CSPD's investigation of Kelly's death. Ray spent several hours reviewing CSPD's case file, which included the officers' written reports, photographs of Kelly's body and the interior of the house, the body camera footage, and the medical examiner's report. After reviewing the contents of CSPD's file, Ray concluded there was nothing to disprove CSPD's conclusion that Kelly's death was a suicide.

Ray explained that what impressed him most about the evidence in this case was the lack of blood, or the "blood void," on the inside of Kelly's left hand. A photo taken at the scene by a forensic technician showed that only part of the inside of Kelly's hand had blood on it. To some CSPD officers, the "blood void" on the inside of Kelly's left hand showed that Kelly was holding the revolver in her left hand when it was fired. According to this theory, the revolver shielded part

of the inside of Kelly's left hand from the blood spatter and created the void. However, Ray could not say that the photo taken by the forensic technician established that Kelly was holding the revolver in her left hand when she was shot. Ray further explained that, initially, he was not comfortable with the positioning of Kelly's left hand in the photographs, so he continued to "dig and dig and dig." He explained that "even when [he] saw the void, the hand didn't make sense." But after viewing the body camera footage Ray "ultimately determined [that Kelly's left] hand was moved by one of the responding officers." When Ray understood that one of the first responding officers "had changed the position of [Kelly's] hand," it made Ray "a little more comfortable with it."

Contrary to Coulson, Ray did not attach any significance to the lack of fingerprints on the revolver, stating that he had not had "a lot of luck with latent prints on handguns . . . . It's great if it's there. It's usable evidence but it is not always there." Ray agreed that the trajectory of the bullet could be important in determining what had happened to Kelly. Ray also testified that the fact that appellant had moved the revolver was less than ideal and that it would have been better if CSPD had seen location of the firearm after it was fired. Ray agreed with Coulson that a .357 magnum revolver had "a lot of kick to it." He had used a .357 revolver for most of his career, and he remembered that when he first started using this type of firearm, it was "an adjustment" for him. Ray also testified about investigation techniques, contending there were no set rules about questioning suspects "outside of their environment." According to Ray, the circumstances of the investigation and how a person responds to the officer usually dictates where a police interview takes place. On another topic, Ray agreed that police sometimes have child witnesses interviewed by a forensic interviewer, but not always. He probably would have had the four-year-old child in this case interviewed by a forensic interviewer. Ray explained that the reason for using a forensic interviewer is to see if the child is telling a different story from what someone else is telling.

Ray did not remember that appellant gave inconsistent statements to the officers at the scene. But when he was reminded of some of appellant's statements, Ray agreed that they sounded inconsistent. Ray agreed that the inconsistencies in appellant's statements may have been a reason for Alaniz to sit down with appellant and figure out if the inconsistencies were the result of appellant being traumatized or for some other reason. But Ray did not want to speculate on what he would have done differently in this investigation because he was not there. He emphasized that his role was to review what CSPD had done.

***Additional Evidence***

<u>Kelly's Siblings</u>

Kelly's older sister, Rose, testified that she did not believe that Kelly committed suicide. According to Rose, she and Kelly saw each other all the time and Kelly was not depressed or suicidal. To the contrary, Rose felt that Kelly "was coming into her own" and "doing what she loved." Kelly was extremely dedicated to her three children, was working out regularly at a new gym, and was preparing for an upcoming show for her clothing business.

Rose was aware of marital discord between Kelly and appellant concerning money and finances. In December 2018, Kelly and appellant argued in her presence. The crux of the argument was that Kelly "didn't know how much money they had and [appellant] wouldn't let her know how much money" they had. Kelly had just learned appellant had another separate bank account, and Kelly felt that appellant "was hiding something from her." After the argument, Kelly was "very, very, very upset." Additionally, in July 2019, Rose witnessed Kelly's disappointment when

appellant told her, in front of Rose and other extended family members, that they did not qualify for a mortgage for a bigger house.[7]

Kelly's younger brother, John, testified that he and Kelly were very close, seeing each other twice a week. In the year preceding her death, Kelly was not depressed. In fact, he never knew Kelly to be depressed or suicidal. Kelly was an "awesome mom," who loved her children and would do anything for them.

John was a licensed real estate agent. In March and April 2019, he started helping Kelly and appellant in their search for a bigger house for their growing family. John knew that appellant had contacted a mortgage broker to try to qualify for a mortgage.

John further testified that he had concerns about appellant's behavior. In 2017, John and appellant went to a conference out of town. When John and appellant went out for drinks, John felt that appellant was flirting with the women at the bar and "getting close to" one woman in particular. But John never mentioned his concerns to appellant or Kelly. In June 2019, John recalled that appellant, Kelly, and the entire family went out for dinner together to celebrate Father's Day. Appellant got drunk at dinner and his behavior made everyone uncomfortable. Appellant remembered Kelly's reaction to appellant's behavior and she was not happy with him.

*Kelly's Acquaintances and Friends*

A business acquaintance, Vera, testified that she owned a gift shop, where Kelly sometimes operated a "pop-up booth" selling her children's clothing. When there were no customers, Vera and Kelly talked. Vera remembered that she and Kelly had conversations about Kelly's marriage.

---

[7]There was evidence from which the jury could infer that appellant was not truthful with Kelly about their inability to qualify for a mortgage for a bigger house. The evidence showed that Kelly was searching for a bigger house in March and April 2019 and was awaiting information about whether or not they qualified for a mortgage. Mortgage broker Trent Pride testified that appellant filed a loan application with his company on March 28, 2019, and it was denied on April 3 or 4, 2019. Nevertheless, the evidence at trial showed that appellant did not tell Kelly about the denial of the mortgage application until July 2019. Although appellant told Kelly his mortgage application was denied because her business was too new, Pride testified that the application was denied because of a credit review.

Vera and Kelly discussed some of the differences between a healthy marriage and an unhealthy marriage. Vera recalled that about a year before Kelly died, she and Kelly had a conversation in which she made specific recommendations to Kelly about her marriage and her finances. She advised Kelly to get copies of her bank statements. She also reassured Kelly that it was "okay" for her to know her checking account balance and to check the mail.

One of Kelly's friends, Lisa, testified that she and Kelly had met through church. According to Lisa, Kelly was an exceptional mother—"nurturing, loving, kind, [and] did everything that [the children] needed." Normally, Kelly was "happy" and "upbeat," but Lisa felt that Kelly's mood was different in September 2019. Lisa knew that Kelly was having a lot of pain from her C-section. The last time Lisa saw Kelly was on September 29, 2019, which was about a week before her death. Kelly had asked Lisa to walk A.K.B. from the church parking lot to her preschool classroom, and Lisa had agreed to help Kelly. Lisa testified that when she and Kelly met in the parking lot that morning, she could see the stress on Kelly's face.

Another friend, Ann, testified that she and Kelly had known each another since childhood. She described Kelly as a very strong-willed person, who set high standards for herself. Ann thought that Kelly could meet every goal she set for herself. When asked if Kelly would have knowingly let her house go into foreclosure, she responded that Kelly would have done her best to meet whatever deadlines she needed to meet.

The last time Ann saw Kelly was several months before her death in July 2019. At the time, Kelly expressed concerns about the birth of her third child and about adding another person to her life. When Ann learned about Kelly's death, her first thought was that Kelly had taken her own life. Ann did not believe that appellant had anything to do with Kelly's death.

*Medical Records*

Over 1300 pages of Kelly's medical records were admitted into evidence, which showed that during a clinic visit on August 6, 2019—less than two months before Kelly's death—a health care provider observed that Kelly was "negative for post[-]partum depression. P[atient] reports "normal baby blues" and "denied thoughts of harming self, baby or others but reports frequent crying spells and being more emotional."

Kelly's medical records also showed that on August 26, 2019, Kelly saw her obstetrician for a follow-up visit. Her obstetrician observed: "[Kelly's] [m]ood is feeling down. Feeling overwhelmed with caring for all her kids; also, some extended family stress. Her husband is working and completing Phd. Had some mild [post-partum] depression in the past; has worked with a counselor in the past." Her obstetrician's assessment for the visit stated: "Normal post[-]partum course and exam" and "mild [post-partum] depression." The obstetrician's notes state that they discussed Kelly's mood, coping strategies like asking for help with tasks, and the possibility of medication, which Kelly declined "for now." Additionally, the obstetrician's notes stated: "No flare of [autoimmune] arthritis. Has follow up with [rheumatologist]."

Finally, on the same day, Kelly responded to a post-partum depression survey by stating that: (1) the thought of harming herself had occurred to her "[n]ever"; (2) she was so unhappy that she cried "[o]nly occasionally"; (3) she felt sad or miserable "[n]ot at all"; and (4) she was so unhappy that she had difficulty sleeping "not at all."

**Verdict, Judgment, and Post-Trial Motions**

The jury found by clear and convincing evidence that appellant had engaged in conduct which endangered the physical health or emotional well-being of the children, and that termination of the parent-child relationship between him and the children would be in the children's best

interest. Having found in favor of termination, the jury did not reach the questions concerning the alternative claim for conservatorship under section 153.131 of the family code.

Appellant filed a motion for new trial and a motion for judgment notwithstanding the verdict. The trial court held a hearing on appellant's post-trial motions but did not grant them. The trial court rendered judgment terminating appellant's parental rights to the children and it appointed appellees the children's managing conservators. This appeal followed.

## STANDING

Appellant argues that appellees lacked standing because they "did not establish any present significant impairment to the children's physical or emotional wellbeing."[8] Section 102.004 of the family code provides in relevant part:

> In addition to the general standing to file suit provided by Section 102.003, a grandparent . . . may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development.

TEX. FAM. CODE § 102.004(a)(1). In this context, "satisfactory proof" means "a preponderance of the evidence." *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd).

In his opening brief, appellant cites a single case, *In re S.M.D.*, to support his standing argument. In *In re S.M.D.*, we held that a grandparent failed to meet her burden to establish standing under section 102.004 of the family code and, therefore, the trial court should have dismissed her suit. We reasoned that "[t]he evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally

---

[8]Appellant further argues appellees lacked standing because section 102.004 of the family code permits a grandparent to seek managing conservatorship only. *See* TEX. FAM. CODE § 102.004 (providing that a grandparent may file an original suit requesting managing conservatorship under certain circumstances). However, as noted by appellees in their response to the motion to dismiss, they had standing to seek termination under 102.005(5) (providing that "another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing" may seek termination of the parent-child relationship). There is ample evidence in the record establishing appellees' substantial past contact with the children.

impaired or physically harmed." *Id*. at 16. After examining the evidence presented, we recognized that it did not show that the child's father was "an angry, violent man, who was hostile to [the child]," "refused to have anything to do with her," and "had idea how to care for [her]." *Id*. at 20. We noted that the grandmother's argument that father would significantly impair the child's physical health or emotional development was reduced to two facts: (1) that the father had never held the child; and (2) that grandmother, over a two-month period, had already formed a relationship with the child. *Id*. We ultimately concluded: "No evidence was presented . . . of any conduct, behaviors, or habits of [the parent] that would probably cause physical or emotional harm to the child." *Id*.

Here, by contrast, appellees provided "evidence of specific, identifiable conduct that would probably cause harm to the child[ren]." *Id*. at 21. Appellees attached two affidavits to their petition containing details about Kelly's death and the reasons they did not believe that Kelly committed suicide. These affidavits stated that (1) Kelly was right-handed but died of a single gunshot wound to the left temporal area; (2) Kelly did not appear to be depressed in the weeks and days before her death; (3) appellant had lied to Kelly and appellees about making the mortgage payments on the couple's house; (4) appellant had a strong motive to take Kelly's life because his lies were about to be exposed due to the couple's imminent eviction; (5) the oldest child had made a statement contradicting appellant's statement that he and the child were together in the living room when they heard the gunshot that ended Kelly's life; (6) based on the circumstances surrounding Kelly's death, they believed that appellant had killed Kelly; and (7) they were concerned about the children's safety when appellant learned about their suit. Appellees also presented evidence at trial to support their contention that appellant had shot and killed the children's mother.

Based on this record, we hold that appellees met their burden to establish that the children's present circumstances would significantly impair their physical health or emotional development.

Accordingly, appellants established their standing under section 102.004(a)(1) of the family code. *See In re Vogel*, 261 S.W.3d 917, 922 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (holding grandmother had standing to petition for managing conservatorship of her grandson when she presented proof that father was a long-time alcoholic, testimony showed it would be "harmful" for child to live with father, father conceded he could not financially provide for the child at the time, and father had removed the child from the mother's funeral and left him in the care of non-relatives); *see also In re Caudillo*, No. 03-19-00208-CV, 2020 WL 6478417, at \*5 (Tex. App.—Austin Oct. 28, 2020, orig. proceeding) ("Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent.").

### "NO-EVIDENCE" CHALLENGES TO EXPERT TESTIMONY

Appellant next argues that the testimony of two of appellees' experts, Coulson and Harrison, is "no-evidence." According to appellant, "Appellees failed to establish that their experts are qualified and that their opinions are relevant and reliable. Therefore, [a]ppellees' expert testimony is legally insufficient to support the verdict."

A trial court has broad discretion in determining the admissibility of expert testimony. *Gulley v. State Farm Lloyds*, 461 S.W.3d 563, 568 (Tex. App.—San Antonio 2014, pet. denied) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006)). "In its role as gatekeeper, the trial court is only required to ensure that the expert testimony is based on a reliable foundation and is relevant to the issues in the case." *Id*. (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex.1998)). "The trial court does not decide whether the expert's opinion is correct, but only whether the analysis used to reach the expert's conclusion is reliable." *Id*. (citing *Gammill*, 972 S.W.2d at 728).

"The rule on preservation of error regarding the reliability of expert testimony is that a challenge to the underlying methodology, technique, or foundational data used by the expert must be preserved by a specific, timely objection to permit the trial court to evaluate the scientific methodology and data in its role as gatekeeper." *Id*. Similarly, "[a]n expert's alleged lack of qualifications are defects of form to which an appellant must object and obtain a ruling to preserve error." *Expro Am., LLC v. Sanguine Gas Expl., LLC*, 351 S.W.3d 915, 919-20 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *see Duncan–Hubert v. Mitchell*, 310 S.W.3d 92, 102, 105 (Tex. App.—Dallas 2010, pet. denied). "When a party wishes to complain that expert testimony is legally insufficient to support the judgment because the basis offered for it is unreliable, it should challenge the admission of the testimony before trial or object when it is offered." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020) (citing *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816-17 (Tex. 2009)).

Nevertheless, an exception to error preservation exists for "face of the record" challenges. "[A] party need not object in order to challenge the [expert testimony] as conclusory or speculative on its face." *Id.* (citing *Pollock*, 284 S.W.3d at 816-17); s*ee also Gulley*, 461 S.W.3d at 568 ("A trial objection is not required . . . to preserve a challenge to speculative or conclusory testimony which is non-probative on its face."). "Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (quoting TEX. R. EVID. 401). The Texas Supreme Court "has labeled such testimony as 'incompetent evidence,' and has often held that such conclusory testimony cannot support a judgment." *Id*. Furthermore, the supreme court "has held that such conclusory statements cannot support a judgment even when no objection was made to the statements at trial." *Id*.

*Challenges to Harrison*

On appeal, appellant complains about Harrison's expert testimony because: (1) he was not qualified to offer opinions about suicide predictability, demographics, actuarial data, and epidemiology to determine whether a particular individual committed suicide; (2) no objective source material substantiated Harrison's methodology; (3) Harrison failed to identify the source material for his opinions; (4) appellees failed to establish that the data underlying Harrison's opinion was reliable and, thus, any opinions drawn therefrom were unreliable; (5) publication and peer review are important to an expert's integrity, and Harrison admitted he never published or was subjected to peer review; (6) Harrison violated the American Psychological Association Guidelines; (7) Harrison failed to consider certain facts that supported suicide; (8) Harrison never explained his methodology; (9) Harrison never established that his opinion was more than his own conclusory, subjective opinion; (10) appellees failed to establish that Harrison relied upon sound methodology because: (a) it was not shown that the factors Harrison identified and relied on were accepted as valid in the forensic psychological community, (b) it was not shown that forensic psychologists relied on the factors that Harrison relied on, and (c) it was not shown that "predic[]tions based upon those factors [that] Harrison identified and relied on [had] been verified as accurate over time"; and (11) Harrison's opinion was not reliable because he formed his conclusion first and then worked backwards to "try to find stuff to support a particular opinion." However, most of these complaints about Harrison were never presented to the trial court.

Immediately before Harrison testified, the trial court held a hearing outside the jury's presence. At this hearing, appellant made several objections, which the trial court overruled.[9] After

---

[9]At the hearing, appellant articulated the following objections: (1) Harrison was not qualified to testify about Kelly's medical records because he was not a medical doctor; (2) the factual basis for Harrison's opinion was not reliable because "it [was] not based on investigation," "it [was] based on witness statements and statistics he pull[ed] out of

reviewing the relevant part of the record, we conclude that of the eleven arguments appellant presents on appeal, only one of them, argument (11), was properly preserved by a timely objection at trial, and only one of them, argument (9), is a "face of the record" challenge for which no pre-testimony objection is necessary. Accordingly, the only arguments we address are arguments (11) and (9).

In argument (11), appellant contends that Harrison's opinion was not reliable because he formed his conclusion first and then worked backwards to find facts to justify it. Here, appellant's contention is that Harrison improperly concluded that Kelly was not suicidal before he had reviewed her medical records. The record shows that before the temporary orders hearing, Harrison had reviewed the affidavits attached to appellees' petition and the private investigator's file and had obtained additional information from a one-hour interview with Kelly's mother. However, Harrison did not have access to Kelly's medical records before the temporary orders hearing. At the temporary orders hearing, Harrison testified that a diagnosis of major depression would raise suicide concerns, but ordinary post-partum depression would not.

By the time he testified at trial, Harrison had reviewed Kelly's medical records, which showed that Kelly suffered from mild post-partum depression. At trial, Harrison testified that there were no signs of a major depression diagnosis in Kelly's medical records and that nothing in her medical records caused him to change his opinion from the temporary orders hearing. In fact, at trial, Harrison testified that Kelly's medical records "entrenched" his earlier opinion that it was unlikely that Kelly committed suicide. The trial court did not abuse its discretion in overruling

---

thin air to support whatever theory he has"; (3) he "jumped to the conclusion" that Kelly was not likely to have committed suicide after only a short interview with Kelly's mother; and (4) he reached his conclusion first and then "tried to find stuff to support a particular opinion."

appellant's objection that Harrison was not reliable because he formed his conclusion first and then worked backwards to find facts to justify it.

In argument (9), appellant argues that Harrison never established that his opinion was more than his own conclusory opinion. Expert testimony is conclusory—and an objection unnecessary—if no basis for the opinion is offered, or if the basis offered provides no support for the opinion. *Pike*, 610 S.W.3d at 787 (citing *Pollock*, 284 S.W.3d at 818). Here, Harrison provided a basis for his opinion, and the basis he offered supported his opinion. Harrison opined that Kelly, more likely than not, did not commit suicide. Harrison identified specific risk factors that contraindicated suicide in this case, such as Kelly's lack of a history of substance or alcohol abuse and her lack of a history of severe mental health illness. Harrison further explained that women are significantly less likely than men to commit suicide by using a firearm, and that Kelly was part of a specific group—young, white women with a child—that has an extremely low rate of suicide. Harrison thoroughly explained the basis for his opinion that Kelly—more likely than not—did not commit suicide. We conclude that Harrison's no-suicide opinion was not conclusory.

*Challenges to Coulson*

On appeal, appellant challenges Coulson's expert testimony because he: (1) did not follow his own stated methodology by failing to collect and gather information before reaching a conclusion; (2) was not a qualified trace evidence expert; (3) was not qualified to offer an opinion regarding autopsy testing and interpret these findings; (4) mischaracterized the procedures police could have used to obtain evidence in this case; (5) based his conclusion that the officers at the scene may have cross-contaminated evidence "on an unfounded assumption" that was "connected to the facts only because [he] said so"; and (6) wrongly criticized CSPD's investigation for (a) not isolating and interviewing the oldest child, (b) failing to interview appellant at the police station, (c) not verifying the truth of appellant's statement regarding Kelly's

post-partum depression, (d) not considering if appellant had a motive to kill Kelly, (e) not performing distance determination testing, and (f) not considering the feasibility of Kelly shooting herself.

In the trial court, appellant did not present any objections to Coulson's qualifications or the reliability and relevance of his testimony. Thus, on appeal, we can only consider appellant's "face of the record" challenges claiming that Coulson's testimony was conclusory or speculative. *See Pike*, 610 S.W.3d at 786. Only arguments (5) and (6) are "face of the record" challenges. Appellant's remaining complaints about Coulson were not presented to the trial court and, therefore, are not preserved for appellate review. *See id.*; *Gulley*, 461 S.W.3d at 568; *Expro Am.*, 351 S.W.3d at 919-20.

As to argument (5)—appellant's complaint about Coulson's cross-contamination testimony—we reject appellant's contention that this testimony was conclusory. "[A]n expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019); *see also Pike*, 610 S.W.3d at 787. "Experience alone may provide a sufficient basis for an expert opinion." *Windrum*, 581 S.W.3d at 769 (citing *Gammill*, 972 S.W.2d at 726).

Here, Coulson's cross-contamination opinions were not baseless. Coulson had served in the FBI for thirty-one years and had supervised many investigations in the past, including two investigations concerning possible suicides. During his testimony, Coulson explained that it was important for law enforcement to ensure that the physical evidence at the scene, including the blood evidence, was not cross-contaminated. In reaching his opinion, Coulson reviewed the body camera footage and the photographs taken at the scene, and he based his opinions on these

depictions of the handling of Kelly's body at the scene.[10] We conclude that Coulson's cross-contamination testimony was not conclusory or speculative.

As to argument (6)—appellant's complaint about Coulson's testimony identifying flaws in CSPD's investigation—we conclude this part of Coulson's testimony was not conclusory or speculative. In making this argument, appellant contends that Coulson's testimony was speculative because Coulson did not know what appellant would have said if he had been interviewed at the police station. Similarly, appellant contends that Coulson's testimony was speculative because Coulson did not know what the child would have said during a forensic interview. We reject these contentions. Coulson was an expert on investigatory practices by law enforcement agencies. In his testimony, Coulson explained why each of the following actions was important to CSPD's investigation of Kelly's death: (a) having the oldest child, who was a witness, interviewed by a forensic interviewer; (b) interviewing appellant at the police station; (c) verifying the truth of appellant's statement regarding Kelly's post-partum depression; (d) considering whether appellant had a motive to kill Kelly; (e) performing distance determination testing; and (f) considering the feasibility of Kelly shooting herself. Coulson explained how these actions, which were standard investigatory practices, would have helped CSPD gain additional information about the circumstances surrounding Kelly's death. We hold that Coulson's testimony about specific deficiencies in CSPD's investigation was not conclusory or speculative.

---

[10]For example, during trial, Coulson testified that one of the photographs admitted into evidence showed Kelly's body "being wrapped in the already-bloody material, it appears to be the mattress cover. That's cross-contaminating your—body." On cross-examination, Coulson referred to this photograph, stating, "I can see that they rolled [Kelly's] body up in a bed sheet—a bloody bed sheet . . . . That would certainly displace the blood around the body."

**LEGAL SUFFICIENCY OF SUBSECTION 161.001(E) FINDING**

Appellant argues the evidence is legally insufficient to support the jury's finding that he engaged in conduct which endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(E).

To terminate parental rights under section 161.001 of the Texas Family Code, appellees had the burden to prove by clear and convincing evidence that appellant committed a predicate ground listed in section 161.001(b)(1) and that termination of his parental rights was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. To determine whether this heightened burden of proof was met, we use a heightened standard of review to decide whether a "factfinder could reasonably form a firm belief or conviction about the truth of the [Appellees'] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *see, e.g.*, *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *O.N.H.*, 401 S.W.3d at 683.

Subsection 161.001(E) allows for termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that "the parent has engaged in conduct . . . which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(E). "Endanger" means "to expose [the children] to loss or injury or to jeopardize [their] emotional or mental health." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *3 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). The endangering conduct need not be directed at the children. *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021). "The specific danger to the children need not be established

independently, but rather may be inferred from the parental misconduct." *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 58 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). The inquiry is "whether there is evidence that a parent's acts, omissions, or failures to act endangered the [children's] physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *3.

"[M]urder of one parent by the other has long been considered a ground for termination" under subsection (E). *In re E.M.N.*, 221 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.); *see In re S.B.*, 207 S.W.3d 877, 885 (Tex. App.—Fort Worth 2006, no pet.) (affirming termination under subsection (E) when father murdered children's mother while the children were present); *Porter*, 105 S.W.3d at 59 (affirming termination under subsection (E) when, among other facts, two of the four children saw their father shoot and kill their mother); *In re S.K.S.*, 648 S.W.2d 402, 404 (Tex. App.—San Antonio 1983, no writ) (affirming termination on failure to support but noting that if the father's conviction had not been on appeal, "surely a final conviction for the murder of the mother of the child would constitute the conduct described in sub [section] (E).").

In reviewing the legal sufficiency of the evidence to support a jury's finding in a parental termination case, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume "the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. (quoting *J.F.C.*, 96 S.W.3d at 266).

We now review the evidence under the above-stated legal sufficiency standard. The evidence included photographs and body camera videos showing that when Kelly was shot, she was lying in bed on her stomach with her head by the pillows, and the sheets and blankets covering

her body up to her waist. Becker testified that the revolver was somewhere between one to six inches from Kelly's left temple when it was fired. Coulson testified that he doubted Kelly could have pulled the trigger and shot herself though both temples while holding the heavy .357 magnum revolver one to six inches from her head. Together, the location and the trajectory of the wound, Kelly's body position, and the fact that Kelly would have had to have used her non-dominant, left hand indicated that Kelly's fatal wound was not self-inflicted. As even appellant acknowledged in his testimony, Kelly had resisted shooting a firearm with her left hand. Furthermore, there was evidence—a text message between appellant and Kelly—indicating that Kelly had never fired the .357 revolver before.[11] Plus, no fingerprints—not even Kelly's—were found on the revolver. Based on the cumulative force of the physical evidence, reasonable jurors could have found that Kelly did not commit suicide.

The evidence further showed that appellant was the only other adult in the house when Kelly was shot. Appellant told police that after he heard the gunshot, he picked up the revolver, carried it to the bathroom counter, washed his hands, and called 911. Appellant, however, made inconsistent statements to officers about where he found the revolver. Appellant told some officers that he found the revolver in Kelly's hand, but he told other officers that he found it on the bed by Kelly's waist. Reasonable jurors could have found that Kelly did not shoot herself, but instead that appellant shot her.

The evidence also showed that the top risk factors for suicide were alcohol or substance abuse and severe mental health issues, such as major depression. Kelly presented none of these risk factors. Her family members testified that they had never known Kelly to be depressed or suicidal. Kelly's medical records further showed that she was not suicidally depressed. At most,

---

[11]On May 9, 2017, Kelly sent a text message to appellant asking, "Which gun did u leave," to which appellant replied "The 40 and 357" "You've shot the 40."

Kelly had mild post-partum depression, but post-partum depression did not put Kelly at risk for suicide. Additionally, Kelly's circumstances—a white woman with young children—contraindicated suicide. According to her close family members, there was nothing in Kelly's behavior indicating that she was depressed or suicidal. To the contrary, Kelly had imminent plans—that morning her mother was coming to the house to babysit and she and appellant were going to the district attorney's office. Later that day, Kelly had an appointment with her hair stylist. The next weekend, Kelly had a show for her clothing company. As her sister testified, when she died, Kelly was coming into her own personally and professionally. Kelly was a loving mother who took good care of her children. Reasonable jurors could have found that Kelly would not have traumatized her children by shooting herself while they were in earshot. Reasonable jurors also could have found that Kelly would not have committed suicide and left her children without a mother.

The evidence further showed that when appellees talked to her the evening before she died, Kelly was concerned about the eviction, but she was not distraught. Even though Kelly had just learned of the eviction notice, she likely did not know the full extent of the family's financial turmoil. Until appellant told her otherwise in July 2019, Kelly was under the impression that she and appellant would be able to qualify for a mortgage for a bigger house. Kelly's name was completely omitted from the legal action appellant had filed to try to stop the foreclosure. And, until the day before she died, appellant was representing to Kelly and appellees that all the mortgage payments on their house had been made. Plus, during her last phone conversation with her parents, Kelly, appellant, and appellees had devised a plan to address the matter, and they were going to act on that plan the following morning. Kelly and appellant would go to the district attorney's office with proof that they had made their mortgage payments, and Kelly's mother would come over early the next morning to babysit. Finally, there was evidence that Kelly had a

close relationship with her parents, and she knew that she could rely on them for financial or other assistance if necessary. Reasonable jurors could have found that Kelly's financial stress was a new development, which she was able to manage.

The evidence showed that Kelly and appellant had conflicts in their marriage, particularly when it came to finances. A business acquaintance had advised Kelly that she had a right to know the balance in her bank account and the right to check the mail. Kelly's sister had witnessed an argument between Kelly and appellant about a secret bank account. Another flashpoint in the marriage was the couple's failure to qualify for a mortgage for a bigger house. Appellant waited several months to tell Kelly that their mortgage application had been denied, which was very disappointing to Kelly. Appellant told Kelly that their application was denied because her business was too new, when in fact it was denied based on a credit review. In addition, text messages and testimony showed that Kelly had no control or knowledge of the couple's finances.[12] Reasonable jurors could have found that appellant had lied to Kelly about important financial matters and that Kelly was not fully aware of the extent of the family's financial turmoil.

The evidence also showed that appellant was responsible for making the mortgage payments on the house, which he did from an account that was in his name only. Kelly did not have the login information for their mortgage account. The evidence showed the mortgage had been in default since December 2018, meaning appellant had failed to make more than ten mortgage payments. Nevertheless, the night before Kelly died, appellant told Kelly and appellees that all the mortgage payments had been made. Furthermore, appellant had filed a petition in court

---

[12]Not only did Kelly's business acquaintance, Vera, testify about Kelly's lack of control and knowledge over the couple's finances, text messages were admitted into evidence reinforcing this notion. In ten text messages Kelly asked appellant, "How much money do we have now"? In another text message, Kelly asked, "How bout I just get your login info so I can quit asking how much money we have," to which appellant never responded. In another text, Kelly asked appellant, "How did you try to transfer me the 1000 last week" . . . a "check or a wire transfer" . . . "You need to answer me". . . "How are you depositing into my account." In another text to appellant Kelly asked, "Can you transfer me 450 for my credit card this week please"?

to try to stop the foreclosure. Kelly's name was not included on the petition, providing further proof that Kelly was unaware of the foreclosure proceedings and the extent of the financial turmoil. Thus, the evidence showed that appellant had repeatedly lied to Kelly about serious financial matters. Then, after Kelly's death, appellant tried to shift the blame to Kelly for the loss of their house, telling Kelly's father that Kelly had told him that she had missed three mortgage payments on the house. Appellant admitted in his testimony that his statement about Kelly missing the mortgage payments was untrue and that he was trying to shift the blame to Kelly for the loss of their house. Reasonable jurors could have found that appellant shot Kelly to ensure that no one would learn about his lies and his complete mismanagement of the family's finances.

Viewing all the evidence in the light most favorable to the jury's verdict, we hold that a rational jury could have formed a firm belief or conviction that appellant shot and killed Kelly, thereby endangering the children's physical or emotional well-being. *See In re S.B.*, 207 S.W.3d at 885; *Porter*, 105 S.W.3d at 59. We hold the evidence is legally sufficient to support the jury's finding under section 161.001(b)(1)(E).

### FACTUAL SUFFICIENCY OF SUBSECTION 161.001(E) FINDING

Next, appellant argues the evidence is factually insufficient to support the jury's finding that he engaged in conduct which endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(E). In reviewing the factual sufficiency of the evidence, we perform "an exacting review of the entire record" and consider disputed or conflicting evidence. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014); *J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.O.A.*, 283 S.W.3d at 345 (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). Under these standards, the factfinder is the

sole judge of the weight and credibility of the evidence. *See id.* at 346; *In re H.R.M.*, 209 S.W.3d 105, 108-09 (Tex. 2006).

In arguing that the evidence is factually insufficient to support the jury's finding, appellant emphasizes certain evidence—the suicide conclusions reached by CSPD and the medical examiner, Ray's testimony that nothing in the case file "disproved" CSPD's suicide conclusion, the blood void on Kelly's left hand, and the documents the mortgage company sent to him and Kelly concerning the delinquency and foreclosure. However, this evidence does not render the jury's finding factually insufficient.

First, although the lead detective, Alaniz, testified that he had conducted an investigation into Kelly's death and had concluded that she committed suicide, appellees' expert, Coulson, explained how Alaniz's investigation was flawed. Furthermore, Coulson testified that it was not feasible for Kelly to have committed suicide. The medical examiner also testified that she had concluded that Kelly's death was a suicide; however, she acknowledged that her suicide finding was premised on Alaniz's reports that Kelly was suffering from post-partum depression and under financial stress. Furthermore, on cross-examination, the medical examiner testified that the investigative findings in this case were limited to the information Alaniz provided. She further testified that if the investigative findings had included a confession or proof of homicide, she would have changed her manner of death conclusion to homicide.

Second, although Ray testified that after reviewing CSPD's file he found nothing to disprove the suicide finding, he also acknowledged that he probably would have done some things differently. For example, Ray testified that he probably would have arranged for the oldest child to talk to a forensic interviewer. Appellees' expert, Coulson, criticized aspects of CSPD's investigation, expressing concern about the way the initial responding officers moved Kelly's body and failed to prevent cross-contamination at the scene. Coulson also criticized Alaniz for not

interviewing appellant at the police station, not arranging for the oldest child to be interviewed by a forensic interviewer, and not confirming the representations that appellant had made to him about Kelly's post-partum depression and financial stress.

Third, there was conflicting evidence regarding the significance of the "blood void" on the inside of Kelly's left hand. A photograph depicting the blood void on the inside of Kelly's left hand was taken by a forensic technician and admitted into evidence.[13] One of the forensic technicians, Elizabeth Lankford, wrote in her report that "[t]here was a void in the bloodstain pattern [Kelly's] left hand," which "was located partially on her palm and on her middle and pointing fingers." Lankford also wrote: "The void defended [appellant's] statement that he had moved the gun from [Kelly's] left hand." According to Coulson, however, an earlier depiction of the inside of Kelly's left hand indicated there was no blood void there when the initial officers arrived on the scene.[14] Coulson based this statement on a "screenshot" photograph derived from the first responding officer's body camera video. Ray, however, cautioned against "jumping to a conclusion" that the "screenshot" photograph showed that blood was covering the inside of Kelly's left hand when the initial responding officer arrived on the scene because body camera footage is "generally kind of blurred." Nevertheless, Ray could not say that the photo depicting the blood void on the inside of Kelly's left hand established that Kelly had held the revolver in her left hand.

To further complicate the blood void issue, a photograph showed that Kelly had a "blood void" on the inside of her right hand, too.[15] Alaniz interpreted the blood void on the inside of

---

[13]The evidence showed that this photograph was taken several hours after the initial responding officers had arrived on the scene.

[14]Consistent with Coulson, Alaniz testified at trial that the initial responding officer's body camera video showed that Kelly's hand was turned up and that there was a lot of blood on it when the officers first entered the bedroom and rolled Kelly's body over. At trial, Alaniz agreed that the existence of blood on the inside of Kelly's left hand could be significant to determining whether Kelly held the revolver in her left hand.

[15]CSPD's forensic technicians did not photograph the inside of Kelly's right hand at the scene. The medical examiner's office photographed the inside of Kelly's right hand, and this photograph was admitted into evidence at trial.

Kelly's right hand to mean that Kelly was holding her cell phone in her right hand when she was shot. A CSPD forensic investigator, Kris Dawson, wrote in her report: "Both [of Kelly's] hands were in a fist-like shape, her fingers curled into the palms. She was reported to have had the gun in her left hand."

As the factfinder, the jury had the sole authority to resolve the above-detailed conflicts in the evidence, and we must presume that the jury resolved these conflicts in favor of its finding if it reasonably could have done so. *In re N.M.A.*, No. 04-21-00256-CV, 2021 WL 5812291, at *4 (Tex. App.—San Antonio Dec. 8, 2021, no pet.). We conclude that the jury reasonably could have resolved the conflicts in the "blood void" evidence in favor of its finding. The jury could have determined that there was no blood void on the inside of Kelly's left hand when the initial officers arrived at the scene, or it could have determined that if there was a blood void on the inside of Kelly's left hand when the initial officers arrived on the scene, it was caused by the position of Kelly's hand and the curling of her fingers, rather than by Kelly holding the revolver in her hand.

Fourth, as to appellant's contention that mortgage statements, notices from the mortgage company, and the recitations in the substitute trustee's affidavit established that Kelly was aware of the "financial turmoil," the evidence was conflicting. The cited documents state that they were sent to both appellant and Kelly, but nothing showed that Kelly had actually received them, opened them, and read them. In fact, there was some evidence—the testimony from Kelly's business acquaintance—indicating that Kelly did not check the mail. Plus, there was other evidence from which the jury could infer that Kelly did not know about the financial turmoil. Appellees testified that when they spoke to Kelly the evening before she died, Kelly was surprised by the eviction. Even appellant testified that when Kelly called him about the eviction notice two days before she died, she was "shocked." Furthermore, on August 26, 2019, in a post-partum depression survey, Kelly stated that she was "not at all" worried, scared, or sad, and had no difficulty sleeping. Such

evidence undermines the notion that Kelly was aware of the couple's financial turmoil, which had been going on for close to a year—the numerous missed mortgage payments, the delinquency notices, and the foreclosure proceedings.

After conducting an exacting review of the entire record and considering the disputed and conflicting evidence, we cannot say that the disputed evidence that a reasonable juror could not have credited in favor of the finding is so significant that the jury could not have formed a firm belief or conviction that appellant engaged in conduct which endangered the physical or emotional well-being of the children. *See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We hold the evidence is factually sufficient to support the jury's finding under section 161.001(b)(1)(E).

### LEGAL AND FACTUAL SUFFICIENCY OF BEST-INTEREST FINDING

Appellant argues the evidence is legally and factually insufficient to support the jury's finding that termination of his parental rights was in the children's best interest. In considering the best interest of the children, the factfinder may consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[16] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d at 27; *see In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet. denied) (noting that a best-interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child[ren]'s best

---

[16]These factors include, but are not limited to, the following: (1) the children's desires; (2) the children's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the children; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the children's best interest; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72). The jury charge instructed the jury that it could consider the *Holley* factors in determining the best interest of the children.

interest." *In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). The same evidence used to prove the predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

In this case, there was ample evidence to support the jury's best-interest finding. Appellant himself testified that a father who murders his children's mother should not raise his children. Here, the jury found that appellant murdered the children's mother. The circumstances showed that appellant committed the murder while the children were present in the home. The jury could have reasonably inferred that the children heard the gunshot. Plus, the body camera evidence depicted the trauma the children experienced in the immediate aftermath. The children had a strong bond with their mother, who had cared for and loved them for their entire lives. Based on appellant's actions, the jury could have determined that appellant placed the children in emotional and physical danger, jeopardized the children's present and future emotional and physical needs, and that his relationship with the children was not a proper one.

Viewing the evidence under the legal-sufficiency standard of review, we conclude that the jury could have reasonably formed a firm belief or conviction that terminating appellant's parental rights was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266. Further, viewing the evidence under the factual-sufficiency standard of review, we conclude that the evidence is such that the jury reasonably could have formed a firm belief or conviction that termination of appellant's parental rights was in the children's best interest. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence is legally and factually sufficient to support the jury's best interest finding.

**UNTIMELY DISCLOSURE OF TESTIFYING EXPERTS**

Appellant argues the trial court abused its discretion by denying his motion to exclude experts Coulson, Harrison, and Becker based on appellees' failure to timely provide expert disclosures in accordance with Rule 195.5(a) of the rules of civil procedure. *See* TEX. R. CIV. P. 195.5(a). For this reason, appellant asserts that the testimony of experts Coulson, Harrison, and Becker is subject to automatic exclusion under Rule 193.6. *See* TEX. R. CIV. P. 193.6.

"Under Rule 193.6, a party may not offer testimony from a witness that was not timely identified unless the trial court finds that (1) there was good cause for the failure or (2) the failure 'will not unfairly surprise or unfairly prejudice the other parties.'" *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (quoting TEX. R. CIV. P. 193.6(a)). "Thus, once it is determined that the witness was not timely designated, a trial court must inquire whether there is (1) good cause for failing to timely identify the witness or (2) a lack of unfair surprise or unfair prejudice." *Id*. The party seeking to introduce the evidence carries the burden of establishing either good cause for the failure to disclose or that the failure will not unfairly surprise or prejudice the other party. TEX. R. CIV. P. 193.6(b). A finding of good cause or lack of unfair surprise or prejudice must be supported by the record. *Id*. The trial court may also "grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response." TEX. R. CIV. P. 193.6(c).

Rule 193.6 has three purposes: (1) to promote responsible assessment of settlement, (2) to prevent trial by ambush, and (3) to give the other party the opportunity to prepare rebuttal to expert testimony. *VSDH Vaquero Venture, Ltd. v. Gross*, No. 05-19-00217-CV, 2020 WL 3248481, at *4 (Tex. App.—Dallas June 16, 2020, no pet.). Therefore, when evaluating the absence of unfair surprise or prejudice, courts consider whether the other party had enough information to reasonably assess settlement, to avoid trial by ambush, and to prepare rebuttal to expert testimony.

*See id*. We review a trial court's decision under Rule 193.6(a) for an abuse of discretion. *Jackson*, 675 S.W.3d at 6.

*Coulson and Harrison*

Appellees concede that, as to Coulson and Harrison, their formal written discovery responses, filed on October 7, 2022, were twenty-six days late and did not include all the information required by Rule 195.5(a). *See* TEX. R. CIV. P. 195.2(a). Nevertheless, appellees contend the trial court did not abuse its discretion in denying the motion to exclude Coulson and Harrison because the record supports the trial court's implied finding that their untimely disclosures would not unfairly surprise or unfairly prejudice appellant.

At the January 3, 2023 pretrial hearing on appellant's motion to exclude, appellees argued that their late disclosure did not cause unfair surprise or prejudice for several reasons. First, Coulson and Harrison had already testified at the temporary orders hearing more than twenty months before trial. Second, they had identified both Coulson and Harrison as testifying experts in their answers to interrogatories about thirteen months before trial. Finally, their initial disclosures for Coulson and Harrison were only nineteen days late. And, although there were deficiencies in their initial disclosures, they filed amended/supplemental disclosures correcting the deficiencies as soon as they became aware of them. The relevant answers to interrogatories, disclosures, and amended/supplemental disclosures were admitted into evidence.

The record shows that both Coulson and Harrison testified at the temporary orders hearing in April 2021, previewing much of the testimony they would later provide at trial. For example, at the pretrial hearing, Coulson expressed his concerns about the police investigation, the role GSR evidence played in the investigation, appellant's movement of the revolver, and how Kelly would have had to use her non-dominant hand to shoot herself. Coulson also opined that Kelly was murdered. In his testimony, Harrison explained the predominant risk factors for suicide, including

alcoholism, substance abuse, and major depressive orders, and that Kelly presented none of these risk factors. Harrison opined that Kelly—more likely than not—did not commit suicide. Thereafter, appellees' May 6, 2021 disclosure identified Coulson and Harrison as witnesses. Then, appellees' November 15, 2021 answers to interrogatories identified Coulson and Harrison as experts. Next, appellees' October 7, 2022 designation of expert witnesses listed Coulson and Harrison as experts, stating that Coulson "will testify regarding the investigation of the death of [Kelly]" and "his conclusions as to cause of death," and that Harrison "will testify regarding the psychology of suicide and homicide as it relates to [Kelly] and the facts of this case, and his conclusions as to the cause of her death." Finally, appellees' December 8, 2022, amended/supplemental designation stated the general substance of each experts' mental impressions and opinions and gave a brief summary of the bases for their mental impressions and opinions.

Based on this record, the trial court could have properly found that appellant was able to assess settlement, avoid trial by ambush, and prepare rebuttal to Coulson's and Harrison's expert testimony. *See Gross*, 2020 WL 3248481, at *4. The trial court did not abuse its discretion by concluding appellees met their burden to establish a lack of unfair surprise or unfair prejudice as to Coulson and Harrison. *See Monzingo v. Flories*, No. 05-22-00719-CV, 2023 WL 6632799, at *5 (Tex. App.—Dallas Oct. 12, 2023, pet. denied) (holding the trial court did not abuse its discretion in finding no unfair surprise or unfair prejudice under Rule 196.3 when expert's identity, credentials, and subjects were timely disclosed; when the general substance of his mental impressions and opinions were adequately disclosed a few days late; and when the opposing party had over a year and a half to digest and prepare to meet the expert's opinions).

*Becker*

Appellees also concede that their disclosure of Becker was twenty-six days late. *See* TEX. R. CIV. P. 195.2(a). Nevertheless, appellees contend the trial court did not abuse its discretion in denying the motion to exclude Becker because the record supports the trial court's implied finding that their untimely disclosure of Becker would not unfairly surprise or unfairly prejudice appellant.

At the January 3, 2023 pretrial hearing on appellant's motion to exclude, appellees informed the trial court that appellant had already had the opportunity to depose Becker. Appellant did not dispute this representation. Additionally, appellees presented evidence of their discovery responses concerning Becker.

The record shows that on October 7, 2022, appellees served appellant with disclosures identifying Becker as a ballistics expert and stating that she would testify regarding her "distance calculations with regard to the gunshot causing" Kelly's death. On December 8, 2022, appellees supplemented their October 7 designation and provided Becker's eighteen-page report, fee schedule, and complete copies of her supporting literature. Finally, appellant was able to depose Becker prior to trial.

Based on this record, the trial court could have properly found that appellant was able to assess settlement, avoid trial by ambush, and prepare rebuttal to Becker's expert testimony. *See Gross*, 2020 WL 3248481, at *4. The trial court did not abuse its discretion by concluding appellees met their burden to establish a lack of unfair surprise or unfair prejudice as to Becker. *See Montemayor v. Ortiz*, 208 S.W.3d 627, 664 (Tex. App.—Corpus Christi-Edinburg 2006, pet. denied) (concluding the record supported an implicit finding of lack of unfair surprise when untimely designated expert was deposed pretrial).

But even if the trial court had abused its discretion by admitting Becker's testimony, the error would be harmless. To reverse a judgment based on error in the admission or exclusion of

evidence, we must conclude that the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *see Jackson*, 675 S.W.3d at 6. "The complaining party must 'demonstrate that the judgment turns on the particular evidence admitted.'" *Jackson*, 675 S.W.3d at 6-7 (quoting *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 148 (Tex. 2004)). "[T]he erroneous admission of cumulative evidence or evidence that does not control a material and dispositive issue is generally harmless and thus does not require reversal of the trial court's judgment." *Id*. at 7 (citing *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989)). When determining if erroneously admitted evidence is harmless, we review the entire record, considering the state of the evidence, the strength and weakness of the case, and the verdict. *Id*.

After considering the entire record, we conclude the admission of Becker's testimony was not harmful. At trial, appellees' expert, Becker, opined that the revolver was fired at "close range," which she defined as one to six inches from Kelly's temple. Appellant's expert, Dierksen, testified that the revolver was fired at "contact to close range." The undisputed evidence showed that neither "close range" nor "contact to close range" ruled out suicide.[17] Accordingly, the judgment did not turn on Becker's testimony. There was other evidence that supported the jury's verdict—the location of the wound, the position of Kelly's body, the size and powerful nature of the revolver, and Kelly's purported use of her non-dominant hand. Also supporting the jury's verdict was evidence that Kelly was not depressed or suicidal, that appellant had repeatedly lied to Kelly about the couple's financial situation, that an eviction from their house was imminent, and that Kelly would have likely discovered appellant's lies if she had survived. For these reasons, we conclude

---

[17]In fact, during closing argument, appellant's counsel pointed out that the differences between Becker's and Dierksen's distance findings were insignificant, arguing: "Ms. Becker's opinions did coincide, to some extent, with the Medical Examiner…. One to six inch[es], okay? Not like their little demonstrative evidence showed, where they highlighted the three to six, like somehow trying to convince you guys or trick you guys into forgetting that [Becker] said one to six."

that even if erroneously admitted, Becker's testimony did not "probably cause[] the rendition of an improper judgment" and was therefore harmless. *See* TEX. R. APP. P. 44.1(a)(1).

*Motion for Continuance*

In a related argument, appellant complains that because "[a]ppellees did not negate unfair surprise or prejudice, the [trial] [c]ourt should have at least granted [appellant's] motion for continuance." However, appellant cites no authority in support of his complaint about the denial of his motion for continuance and, thus, his complaint is inadequately briefed and presents nothing for our review. *See* TEX. R. APP. P. 38.1(i) (stating that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities.").

But even if appellant had adequately briefed this complaint, we would overrule it. "A trial court's denial of a motion for continuance rests within its sound discretion and should not be disturbed unless there is a clear abuse of discretion." *In re R.M.R.*, No. 04-09-00253-CV, 2009 WL 4668899, at *4 (Tex. App.—San Antonio Dec. 9, 2009, pet. denied) (citing *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004)). Here, the record demonstrates that the trial court's ruling was not an abuse of discretion. First, the premise of appellant's complaint is that appellees failed to negate unfair surprise or unfair prejudice, but we have already concluded otherwise. Second, appellant's motion for continuance was filed late. Trial was set to commence on Monday, January 9, 2023, but appellant did not file his motion for continuance until after 4 p.m. on Friday, January 6, 2023. Third, appellant's position on a trial continuance wavered. Six days before trial, at the final pretrial hearing, appellees' counsel explained that the trial court could grant a continuance to cure any possible unfair surprise or unfair prejudice stemming from the untimely disclosures. *See* TEX. R. CIV. P. 193.6(c). But appellant's counsel opposed this remedy at the pretrial hearing. It was not until after the trial court denied appellant's motion to exclude appellees' experts that appellant filed his motion for continuance. One of the reasons for the motion

for continuance was so that he "could have the opportunity to retain additional experts" because of appellees' late designation of Becker. Under these circumstances, the trial court did not abuse its discretion by denying appellant's motion for continuance. *See In re M.S.*, No. 06-12-00089-CV, 2013 WL 772878, at *1 (Tex. App.—Texarkana Feb. 28, 2013, no pet.) (holding trial court did not abuse its discretion in denying motion for continuance in parental termination case that was "urged at or just before the trial date"); *Duerr v. Brown*, 262 S.W.3d 63, 78-79 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding trial court acted within its discretion when it denied requests for continuance based on discovery matters).

## ISSUE PRECLUSION

Appellant further argues that the termination judgment is barred by issue preclusion. In his summary judgment motion, appellant argued that the take-nothing judgment rendered in a wrongful death suit filed by appellees precluded the jury's finding that he murdered Kelly. The trial court rejected appellant's issue preclusion argument and denied his summary judgment motion.

After appellant filed his brief in this appeal, the take-nothing judgment in the wrongful death suit was reversed by the court of appeals. In response, appellant filed a petition for discretionary review in the Texas Supreme Court, but the petition was denied. Accordingly, we summarily overrule appellant's issue preclusion argument. *See In re J.W.*, No. 06-21-00074-CV, 2022 WL 68229, at *8 (Tex. App.—Texarkana Jan. 7, 2022, pet. denied) ("Because the judgment in Father's first appeal was reversed, he cannot now rely on that judgment to assert claim preclusion—also known as res judicata—or issue preclusion—also known as collateral estoppel—as there was no final judgment."); *Waller v. Waller*, No. 12-19-00326-CV, 2020 WL 5406246, at *2 (Tex. App.—Tyler Sept. 9, 2020, no pet.) ("When an appellate court reverses the first judgment, the finality necessary for claim or issue preclusion is eliminated.").

**CONSERVATORSHIP**

Appellant also complains about the trial court's appointment of appellees as the children's managing conservators.

An order terminating the parent-child relationship divests the parent and the children of all legal rights and duties with respect to each other. TEX. FAM. CODE § 161.206(b). Because we have overruled appellant's complaints about the parts of the judgment terminating his parental rights, appellant has been divested of his legal rights and duties related to the children. *See id.* § 161.206(b). Accordingly, appellant lacks standing to challenge the portion of the judgment appointing appellees as the children's conservators. *See In re R.J.*, 579 S.W.3d 97, 120-21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (holding father did not have standing to challenge the portion of the judgment appointing a conservator for the child after overruling father's challenge to the portion of the judgment terminating his parental rights); *E.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (affirming judgment terminating parental rights and holding that parents, who had been divested of their legal rights to child, could not challenge conservatorship determination).

**APPELLEES' CROSS-POINTS**

Appellees bring two cross-points. However, because we affirm the trial court's judgment, we need not address appellees' cross-points. *See* TEX. R. APP. P. 47.1; *Goesling v. Am. Airlines, Inc.*, No. 02-22-00338-CV, 2023 WL 7037650, at *35 (Tex. App.—Fort Worth Oct. 26, 2023, pet. denied).

**CONCLUSION**

The trial court's termination judgment is affirmed.

Liza A. Rodriguez, Justice